**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 16-cv-02505- STV

TINA K. DEBOUSE,

     Plaintiff,

v.

NANCY A. BERRYHILL,[1] Acting Commissioner of Social Security,

     Defendant.

_____

**ORDER**
_____

Magistrate Judge Scott T. Varholak

     This matter is before the Court on Plaintiff Tina K. Debouse's Complaint seeking review of the Commissioner of Social Security's decision denying Plaintiff's application for disability insurance benefits ("DIB") under Title II of the Social Security Act ("SSA"), 42 U.S.C. § 401 *et seq.*, and supplemental security income benefits ("SSI") under Title XVI of the SSA, 42 U.S.C. § 1381 *et seq.* [#1] The parties have both consented to proceed before this Court for all proceedings, including the entry of final judgment, pursuant to 28 U.S.C. 636(c) and D.C.COLO.LCivR 72.2. [#13] The Court has jurisdiction to review the Commissioner's final decision pursuant to 42 U.S.C. §§ 405(g)

_____

[1] Carolyn W. Colvin is the named Defendant in the Complaint as she was the Commissioner of Social Security at the time the Complaint was filed. [#1] Nancy A. Berryhill currently serves as the Acting Commissioner of Social Security. [#19 at 1 n.1] Pursuant to Federal Rule of Civil Procedure 25(d), Nancy A. Berryhill, as Commissioner Colvin's successor, "is automatically substituted as a party." *See also* 42 U.S.C. § 405(g) ("Any action instituted in accordance with this subsection shall survive notwithstanding any change in the person occupying the office of Commissioner of Social Security or any vacancy in such office.")

and 1383(c)(3).  This Court has carefully considered the Complaint [#1], the Social Security Administrative Record [#11], the parties' briefing [#17, 19, 21], and the applicable case law, and has determined that oral argument would not materially assist in the disposition of this appeal.  For the following reasons, the Court **AFFIRMS** the Commissioner's decision.

## I.    LEGAL STANDARD

### A.    Five-Step Process for Determining Disability

The Social Security Act defines disability as the inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."[2]  42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A); *Lax v. Astrue*, 489 F.3d 1080, 1084 (10th Cir. 2007).  "This twelve-month duration requirement applies to the claimant's inability to engage in any substantial gainful activity, and not just his underlying impairment."  *Lax*, 489 F.3d at 1084.  "In determining whether an individual's physical or mental impairment or impairments are of a sufficient medical severity that such impairment or impairments could be the basis of eligibility . . ., the Commissioner [ ] shall consider the combined effect of all of the individual's impairments without regard to whether any such impairment, if considered separately, would be of such severity."  42 U.S.C. §§ 423(d)(2)(B), 1382c(a)(3)(G).

---

[2] "Substantial gainful activity" is defined in the regulations as "work that (a) [i]nvolves doing significant and productive physical or mental duties; and (b) [i]s done (or intended) for pay or profit." 20 C.F.R. §§ 404.1510, 416.910; *see also* 20 C.F.R. §§ 404.1572, 416.972.

"The Commissioner is required to follow a five-step sequential evaluation process to determine whether a claimant is disabled." *Hackett v. Barnhart*, 395 F.3d 1168, 1171 (10th Cir. 2005). The five-step inquiry is as follows:

1. The Commissioner first determines whether the claimant's work activity, if any, constitutes substantial gainful activity;

2. If not, the Commissioner then considers the medical severity of the claimant's mental and physical impairments to determine whether any impairment or combination of impairments is "severe;"[3]

3. If so, the Commissioner then must consider whether any of the severe impairment(s) meet or exceed a listed impairment in the appendix of the regulations;

4. If not, the Commissioner next must determine whether the claimant's residual functional capacity ("RFC")—*i.e.*, the functional capacity the claimant retains despite her impairments—is sufficient to allow the claimant to perform her past relevant work, if any;

5. If not, the Commissioner finally must determine whether the claimant's RFC, age, education and work experience are sufficient to permit the claimant to perform other work in the national economy.

*See* 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4); *Grogan v. Barnhart*, 399 F.3d 1257, 1261 (10th Cir. 2005); *Bailey v. Berryhill*, 250 F. Supp. 3d 782, 784 (D. Colo. 2017). The claimant bears the burden of establishing a *prima facie* case of disability at steps one through four, after which the burden shifts to the Commissioner at step five to show that claimant retains the ability to perform work in the national economy. *Wells v. Colvin*, 727 F.3d 1061, 1064 n.1 (10th Cir. 2013); *Lax*, 489 F.3d at 1084. "A finding that the claimant is disabled or not disabled at any point in the five-step review is conclusive and terminates the analysis." *Ryan v. Colvin*, 214 F. Supp. 3d 1015, 1018 (D. Colo.

---

[3] The regulations define severe impairment as "any impairment or combination of impairments which significantly limits [the claimant's] physical or mental ability to do basic work activities." 20 C.F.R. §§ 404.1520(c), 416.920(c).

2016) (citing *Casias v. Sec'y of Health & Human Servs.*, 933 F.2d 799, 801 (10th Cir. 1991)).

**B.    Standard of Review**

In reviewing the Commissioner's decision, the Court's review is limited to a determination of "whether the Commissioner applied the correct legal standards and whether her factual findings are supported by substantial evidence." *Vallejo v. Berryhill*, 849 F.3d 951, 954 (10th Cir. 2017) (citing *Nguyen v. Shalala*, 43 F.3d 1400, 1402 (10th Cir. 1994)).    "With regard to the law, reversal may be appropriate when [the Commissioner] either applies an incorrect legal standard or fails to demonstrate reliance on the correct legal standards." *Bailey*, 250 F. Supp. 3d at 784 (citing *Winfrey v. Chater*, 92 F.3d 1017, 1019 (10th Cir.1996)).

"Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. It requires more than a scintilla, but less than a preponderance." *Wall v. Astrue*, 561 F.3d 1048, 1052 (10th Cir. 2009) (quoting *Lax*, 489 F.3d at 1084).    "Evidence is not substantial if it is overwhelmed by other evidence in the record or constitutes mere conclusion." *Grogan*, 399 F.3d at 1261-62 (quoting *Musgrave v. Sullivan*, 966 F.2d 1371, 1374 (10th Cir. 1992)).    The Court must "meticulously examine the record as a whole, including anything that may undercut or detract from the [Commissioner's] findings in order to determine if the substantiality test has been met.'" *Flaherty v. Astrue*, 515 F.3d 1067, 1070 (10th Cir. 2007) (quotation omitted).    The Court, however, "will not reweigh the evidence or substitute [its] judgment for the Commissioner's." *Hackett*, 395 F.3d at 1172.

## II.    BACKGROUND

Plaintiff was born in 1974.  [AR 27, 249, 262][4]  Plaintiff completed high school and took a year and a half of college courses but did not complete any advanced degree.  [AR 27, 97]  Plaintiff is able to communicate in English.  [AR 27; *see generally* AR 54-80]  On June 3, 2013, Plaintiff protectively filed an application for SSI and, on June 12, 2013, Plaintiff protectively filed an application for DIB.  [AR 14, 249-259]  In both applications, Plaintiff claimed a disability onset date of March 31, 2012, and thus Plaintiff was 37 years old at the time of the alleged onset.  [AR 14, 262]  Plaintiff claims disability based upon physical and mental impairments, including, but not limited to, obesity, irritable bowel syndrome ("IBS"), degenerative disc disease, gynecological illness, right shoulder bursitis and tendinitis, anxiety and depression.  [*See* AR 16; #17 at 26]  Plaintiff's most recent prior work experience was as a payroll clerk at the Mental Health Center of Denver from approximately October 3, 2012 until April 4, 2013.  [AR 64, 318]

### A.    Medical Background

Plaintiff began treatment for chronic pelvic pain in approximately 2009.  [AR 378, 440]  Plaintiff reported pain and abnormal uterine bleeding with fist sized clots during her menstrual periods, which would last five to seven days.  [AR 382, 440]  Plaintiff reported some improvement through the use of oral contraceptives, but continued to experience pain and bleeding.  [AR 442, 444]  A hysterectomy surgery was scheduled for December 21, 2012, but Plaintiff was involved in a car accident on that date, so the surgery was rescheduled for February 1, 2013.  [AR 448, 451]  The successful surgery

---

[4]  All references to "AR" refer to the sequentially numbered Social Security Administrative Record filed in this case.  [#11]

revealed that Plaintiff had an enlarged uterus and extensive adhesions and Plaintiff's uterus was rotated approximately 90 degrees toward the patient's left.  [AR 382, 461-62]  Plaintiff was discharged on February 4, 2013, meeting all post-operative milestones and had good pain control.  [AR 465-68]  At a post-operative follow-up on February 11, 2013, Plaintiff was meeting all post-operative milestones and reported that she was feeling well and very rarely noted any abdominal pain.  [AR 469]

On February 19, 2013, Plaintiff was evaluated by the wound clinic with regard to a complication with the surgical wound.  [AR 470-71]  The wound was treated with silver alginate rope and foam dressing and Plaintiff was instructed to change the dressing every 2-3 days.  [AR 471-73]  At a follow-up appointment on February 26, 2013, the wound clinic noted that Plaintiff was "tolerating dressings [to the wound] at this time" and instructed Plaintiff to change the dressing every 3-4 days.  [AR 474-75]  At a follow-up appointment on March 14, 2013, the wound clinic noted that Plaintiff continued to tolerate dressings and that the wound was "significantly reduced."  [AR 479]  At a post-operative follow-up appointment on March 21, 2013, Plaintiff reported that her incision "has healed well," that she had no abdominal pain, and that the only pain she was experiencing was a result of the car accident that occurred prior to her surgery.  [AR 481]  At a follow-up appointment on April 1, 2013, the wound clinic concluded that Plaintiff's wound was "completely healed, and well approximated" and thus that she could discontinue the use of dressings.  [AR 482]

Immediately following the car accident on December 21, 2012, Plaintiff was taken to the emergency room and complained of "moderate" pain in her neck and lower back.  [AR 449]   Plaintiff was ambulatory and examination revealed "[n]o radiographic

evidence of injury to the cervical or lumbar spines." [AR 449, 490] Plaintiff continued to complain of pain in her neck, back and lower extremities following the accident and participated in various forms of testing and treatment throughout 2013 and 2014, including physical therapy, pain medication and injections. [*See, e.g.*, AR 21, 481, 532-45, 891-991, 1145-51] The injections "relieved her pain for about one week" and reduced the intensity of the pain thereafter. [AR 538] An MRI of the lumbosacral spine taken on September 28, 2013, revealed "multiple levels [of] minimal disc bulges." [AR 532, 546-47] Upon review of the MRI and radiographs, one doctor recommended kyphoplasty surgery on the T12 vertebra, but that surgery does not appear to have been performed. [AR 21, 1024]

Plaintiff also complains of right shoulder pain that started after the car accident. [AR 21, 66-67, 1162-63] A November 2013 MRI revealed no tendon or ligament tears but "[m]ild supraspinatus tendinosis associated with mild subacromial subdeltoid bursitis." [AR 1166] At an appointment with a surgical center on December 3, 2013, Plaintiff reported right shoulder pain with overhead activity, pain that wakes her at night, and pain putting on her shirt or overcoat. [AR 1162] Upon examination of her right shoulder, the doctor observed that Plaintiff had a "[f]ull range of motion" and no deformity, but he found positive signs of impingement. [AR 1163] Although the doctor suggested that arthroscopy of the shoulder may be appropriate, no surgery appears to have taken place. [AR 22, 1161]

Plaintiff also complains of abdominal pain that began in 2006, which she believes to be associated with IBS. [AR 68-69] Plaintiff testified that she has cramping, diarrhea and constipation that requires her to use the restroom for ten to fifteen minutes, three to

four times a day. [AR 68-70] On or about September 26, 2014, Plaintiff was diagnosed with "non-tropical sprue (celiac disease)." [AR 1019] On October 29, 2014, Plaintiff's primary care physician—Dr. Jesper Brickley—noted that Plaintiff requested that he "change the data" on the evaluation form that he had completed for an IBS disability, because Plaintiff had received negative feedback from her attorney. [AR 1110] Dr. Brickley refused Plaintiff's request, and Plaintiff failed to submit the originally completed form to the Commissioner. [AR 22, 1110]

In addition to these physical ailments, Plaintiff also complains of and has received treatment for mental impairments. [AR 22] Plaintiff testified that she has depression that makes her "very tearful," for which she has been treated with therapy, counseling and medication. [AR 71-72] Plaintiff's mental health treatment notes reflect a diagnosis of major depressive disorder, personality disorder NOS ("not otherwise specified"), and social environmental issues. [AR 667, 1034] Although the medications have been helpful, Plaintiff has been inconsistent with her use of them. [AR 22, 1380]

## B.    Procedural History

Plaintiff's application for SSI and application for DIB were initially denied on February 19, 2014. [AR 121-22] On March 26, 2014, Plaintiff filed a written request for a hearing before an Administrative Law Judge ("ALJ"). [AR 194] A hearing was conducted before ALJ Terrence Hugar on March 25, 2015, at which Plaintiff and vocational expert Carly N. Coughlin both testified. [AR 55] Plaintiff was represented at the hearing by an attorney, Hiley Wood. [*Id.*] On June 15, 2015, the ALJ issued a decision denying Plaintiff benefits. [AR 14-28] Plaintiff timely requested a review of that decision by the Appeals Council, which denied her request for review on September 27,

2016.  [AR 1-5]  Plaintiff timely filed an appeal with this Court on October 7, 2016.  [#1]

Because the Appeals Council denied Plaintiff's appeal, the ALJ's decision is the final

decision of the Commissioner for purposes of this appeal.  *See* 20 C.F.R. §§ 404.981,

416.1481, 422.210.

### C.    The ALJ's Decision

The ALJ denied Plaintiff's applications for DIB and SSI after evaluating the

evidence pursuant to the five-step sequential evaluation process.  [AR 14-28]  At step

one, the ALJ determined that Plaintiff had not engaged in substantial gainful activity

since March 31, 2012, the alleged onset date.[5]  [AR 16]  At step two, the ALJ found that

Plaintiff had the following severe impairments:  IBS, obesity, depression, anxiety,

degenerative disc disease, and right shoulder bursitis and tendinitis.  [*Id.*]  At step three,

the ALJ concluded that Plaintiff does not have an impairment or combination of

impairments that meets or medically exceeds the severity of one of the listed

impairments in the appendix of the regulations.  [AR 17-18]

Following step three, the ALJ determined that Plaintiff retained the RFC to

perform light work within the following limitations:

> [Plaintiff] is able to do occasional postural maneuvers, except no crawling
> or climbing of ladders, ropes, or scaffolds.  [Plaintiff] must have no
> exposure to hazards such as unprotected heights and moving mechanical
> parts; also no concentrated exposure to extreme cold.  Overhead reaching
> is limited to occasional and never to be more than 15 pounds.  Mentally,
> [Plaintiff] is able to perform simple, routine and repetitive tasks; can
> maintain concentration, persistence and pace to carry out, understand and
> remember routine and repetitive instructions; and should have no frequent
> changes in the work setting or work duties.  The work must entail no more

---

[5] Although Plaintiff had engaged in some work activity at the Mental Health Center of
Denver subsequent to the alleged onset date, she earned only $1,161 in the fourth
quarter of 2012 and $860 during the first quarter of 2013.  [AR 16, 64, 318]

than occasional interaction with supervisors and coworkers, and she should not interact with or serve the public.

[AR 18-19]  The ALJ provided a narrative setting forth the relevant evidence considered in determining the RFC and explaining the weight given to each of the medical opinions in the record.  [AR 19-26]

At step four, the ALJ found that Plaintiff had no past relevant work under the guidance of the regulations, because her most recent substantial gainful activity concluded in or around 2000.[6]  [AR 26]  Finally, at step five, the ALJ concluded that, considering Plaintiff's age, education, work experience, and RFC, there are jobs that exist in significant numbers in the national economy that Plaintiff can perform.  [AR 27-28]  Specifically, the ALJ agreed with the vocational expert's testimony opining that Plaintiff could perform the following representative occupations:  order agricultural produce, office helper and hand packager.  [*Id.*]  Accordingly, the ALJ determined that Plaintiff was not under a disability from March 31, 2012 through June 15, 2015 (the date of the ALJ's decision).  [AR 28]

## III.  ANALYSIS

Plaintiff raises five challenges to the ALJ's decision on appeal.  First, Plaintiff contends that the ALJ's findings with regard to Plaintiff's gynecological illness were "inadequate and not based on substantial evidence."  [#17 at 33]  Second, Plaintiff argues that the ALJ's consideration of Plaintiff's IBS "contains a number of logical inconsistencies, and therefore his findings regarding IBS are not based on substantial evidence."  [*Id.* at 34]  Third, Plaintiff maintains that the ALJ gave insufficient

---

[6] Pursuant to the regulations, the Commissioner considers prior work experience only "when it was done within the last 15 years, lasted long enough for [the claimant] to learn to do it, and was substantial gainful activity."  20 C.F.R. §§ 404.1565(a); 416.965(a).

consideration to Plaintiff's pain and other non-exertional limitations. [*Id.* at 38] Fourth, Plaintiff argues that the ALJ's findings regarding the weight to be afforded to the opinion evidence were "either based on an improper application of the criteria set forth in the SSA rules, or they are based on completely unsupported findings of fact." [*Id.* at 43] Fifth, Plaintiff contends that the ALJ's findings regarding Plaintiff's shoulder impairment, and the manipulative restrictions related to it, are not supported by substantial evidence. [*Id.* at 46] The Court addresses each of these arguments in turn.

## A. The ALJ's Findings Regarding Plaintiff's Gynecological Illness

Plaintiff argues that the ALJ erred in two respects when considering Plaintiff's gynecological illness. [*Id.* at 30-33] First, Plaintiff contends that the ALJ erred by failing to find that Plaintiff's gynecological illness was a severe impairment.[7] [*Id.* at 30-31] Defendant contends that "it is not relevant" whether the ALJ found the gynecological illness to be a severe impairment, because, in the RFC narrative, the ALJ acknowledged that Plaintiff had pelvic pain and that an ultrasound showed fibroid disease and the ALJ then proceeded to discuss Plaintiff's fibroid disease. [#19 at 12 (citing AR 20-21)] The Court agrees that, to the extent the ALJ erred by failing to find that Plaintiff's gynecological issues constituted a severe limitation, such error was harmless. The ALJ found Plaintiff to have multiple severe limitations at step two of the

---

[7] In her opening brief, Plaintiff referred to her gynecological illness simply as "endometriosis." [#17 at 30-33] In response, Defendant argued that Plaintiff failed to point to any evidence establishing an "actual diagnosis" of endometriosis and thus "[t]he ALJ reasonably did not find that endometriosis was a medically determinable impairment." [#19 at 11] In her reply brief, Plaintiff "concedes that her reliance in her opening brief on the term endometriosis for the sake of brevity may have been inexact, since her gynecological illness had multiple possible concurrent diagnoses." [#21 at 5] Plaintiff argues, however, that it is undisputed that Plaintiff "suffered from anatomical and physiological abnormalities involving her gynecological system, shown by clinical and laboratory diagnostic techniques which were verified by surgery." [*Id.* at 5-6]

five-step sequential evaluation process and thus did not conclude his analysis at step two but instead proceeded to all five steps of the process, including a determination of Plaintiff's RFC. [AR 17-28]  In considering Plaintiff's RFC, the ALJ was required to "consider the combined effect of *all* medically determinable impairments, whether severe or not." *Wells*, 727 F.3d at 1069 (emphasis in original); *see also* 20 C.F.R. §§ 404.1545(a)(2), 416.945(a)(2).  What matters then is not whether the ALJ found Plaintiff's gynecological illness to constitute a severe limitation but rather whether the ALJ gave adequate consideration to Plaintiff's gynecological illness when defining Plaintiff's RFC.  *See Allman v. Colvin*, 813 F.3d 1326, 1330 (10th Cir. 2016) ("[T]he failure to find a particular impairment severe at step two is not reversible error when the ALJ finds that at least one other impairment is severe.").

Second, Plaintiff argues that the ALJ erred by not taking the symptoms of Plaintiff's gynecological illness into account when determining Plaintiff's RFC.  [#17 at 31-33]  Specifically, Plaintiff contends that the ALJ "did not assign any restrictions in [the] RFC related to the one year period between the alleged onset date and the ti[m]e that [Plaintiff's] endometriosis was ameliorated by the hysterectomy."  [*Id.* at 31]  As an initial matter, Plaintiff alleges an onset date of March 31, 2012 and the symptoms of Plaintiff's gynecological illness were relieved by the hysterectomy performed less than twelve months later, on February 1, 2013.  [*See, e.g.*, AR 469 (noting that as of February 11, 2013, Plaintiff was meeting all post-operative milestones and very rarely noting any abdominal pain)]  Although Plaintiff contends that the hysterectomy "limited her ability to function until April 1, 2013" when the wound fully healed [#17 at 31], Plaintiff provides no evidence that the symptoms of her gynecological illness—*e.g.*,

severe pelvic pain and excessive bleeding—continued following the surgery. To the contrary, the record indicates that these symptoms subsided following the surgery [*See, e.g.*, AR 469, 1074] Subsequently, Plaintiff experienced a complication with the surgical wound and was referred to the wound clinic. [AR 471] Plaintiff fails to point to any evidence suggesting that the surgical would significantly impaired Plaintiff's functioning. To the contrary, the record reflects that, at a March 21, 2013 post-operative follow-up appointment, Plaintiff reported that the wound was healing well and that she was not experiencing any abdominal pain. [AR 481] There thus is substantial evidence to support a finding that the impairments caused by Plaintiff's gynecological illness did not continue to persist for a continuous twelve-month duration following the alleged onset date.

Moreover, the ALJ expressly addressed the symptoms of Plaintiff's gynecological illness in his RFC narrative. [AR 20-21] The ALJ acknowledged that "[s]ymptomatically [Plaintiff] had excessive uterine bleeding and pain but only during menses, reporting an absence of pain between menses" but noted that Plaintiff experienced considerable improvement of pain through the use of oral contraceptives prior to surgery and that the subsequent surgery "significantly reduced her pain problems."[8] [AR 21 (quoting AR

_____

[8] Plaintiff contends that "the finding that [Plaintiff] experienced pain and excessive uterine bleeding only during menses is not supported by substantial evidence, and even where it is, [ ] does not convey all the relevant evidence." [#17 at 32] Plaintiff's argument is internally inconsistent, claiming at once both that the finding is unsupported by substantial evidence and that "it is." Regardless, the ALJ's finding clearly is supported by substantial evidence. Plaintiff concedes that there is evidence that "[Plaintiff] had excessive bleeding only during menses." [*Id.* at 32] The medical record cited by the ALJ evidences that Plaintiff's pelvic pain was "always associated with menstrual bleeding" and that Plaintiff "note[d] [an] absence of pain when she is not bleeding." [AR 21 (citing AR 440)] Plaintiff points to evidence not expressly referenced by the ALJ that describes in more detail the quantity and quality of Plaintiff's symptoms

13

1074)]] Plaintiff contends that "[t]he ALJ assigned no RFC restrictions related to [Plaintiff's] pelvic pain or excessive uterine bleeding, and gave no additional explanation as to why he did not do so." [#17 at 32] The Court disagrees. The ALJ expressly referenced Plaintiff's "excessive uterine bleeding and pain" in the narrative description supporting the RFC and stated that his RFC determination was based upon "careful consideration of the entire record," "the totality of the evidence," and "all symptoms and the extent to which [those] symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence." [AR 18, 19, 21, 26] The ALJ's decision spends eight pages summarizing the evidence he considered in formulating the RFC. [AR 18-26] Based upon all of this evidence, including the evidence relating to Plaintiff's gynecological illness, the ALJ defined an RFC that included significant limitations, including a limitation to light work and only "simple, routine and repetitive tasks." [AR 18] In addition, the ALJ expressly confirmed with the vocational expert that the identified jobs in the national economy allowed fifteen percent off-task time, two unscheduled absences per month, and two fifteen-minute and one half-hour break per day.[9] [AR 82-83] The substance of the ALJ's decision thus "gives [the Court] no reason to doubt" that the ALJ's RFC determination was based upon "careful consideration of

_____

referred to by the ALJ simply as "excessive uterine bleeding and pain." [#17 at 32-33] The ALJ's failure to expressly discuss this evidence—which is not inconsistent with his more generalized description of the symptoms—does not constitute error. *See Clifton v. Chater*, 79 F.3d 1007, 1009–10 (10th Cir. 1996) ("The record must demonstrate that the ALJ considered all of the evidence, but an ALJ is not required to discuss every piece of evidence.").

[9] To the extent Plaintiff argues that these limitations should have been incorporated into the RFC, any such error would be harmless. *Moua v. Colvin*, 541 F. App'x 794, 798 (10th Cir. 2013) (finding that any error in omitting a limitation included in the hypothetical provided to the vocational expert from the RFC "is harmless and does not require a remand"); *Seever v. Barnhart*, 188 F. App'x 747, 753 (10th Cir. 2006) (same).

the entire record" [AR 18], including the evidence related to Plaintiff's gynecological illness. *Wade v. Colvin*, 26 F. Supp. 3d 1073, 1079 (D. Colo. 2014).

### B.     The ALJ's IBS Findings

Similarly, Plaintiff argues that the ALJ erred because he "appears to assign no restrictions related to either the pain or the practical difficulties related to gastrointestinal illness." [#17 at 33]   Plaintiff contends that the ALJ's inclusion of IBS as one of Plaintiff's severe impairments is inconsistent with his purported failure to assign any restrictions in Plaintiff's RFC based upon her IBS, because, by definition, a severe impairment must "significantly limit[ ] [the claimant's] physical or mental abilities to do basic work activities." [*Id.* at 34; *see also* 20 C.F.R. §§ 404.1520(c), 416.920(c)]   The Court disagrees that the ALJ failed to include restrictions in the RFC to accommodate Plaintiff's IBS.

In the RFC narrative, the ALJ expressly references Plaintiff's testimony that, when Plaintiff goes to the restroom, it may take 10-15 minutes, after which she is exhausted, and that on bad days, she is constantly in the bathroom trying to use the restroom and experiences cramping. [AR 19]  The ALJ found, however, that Plaintiff's "daily activities [ ] are not limited to the extent one would expect given her complaints of disabling symptoms and limitations." [AR 20]  The ALJ found that "the persuasiveness of [Plaintiff's] subjective complaints" was further diminished, particularly with regard to Plaintiff's IBS, as a result of Plaintiff having asked her doctor to re-do the paperwork regarding her IBS symptoms to make them "worse" after her attorney suggested they may be insufficient to qualify for disability. [AR 20]  The doctor refused and Plaintiff notably appears to not have submitted the original paperwork completed by the doctor.

[*Id.*]  Plaintiff does not dispute these facts.  [#21 at 3 (stating that Plaintiff "does not dispute the evidence the ALJ cited exists")]  Instead, Plaintiff argues that "the negative inferences the ALJ made from these factors are illogical" and therefore constitute error. [*Id.* at 4-5]  In essence, Plaintiff asks this Court to reweigh the evidence considered by the ALJ to reach a different conclusion.  The Court, however, is prohibited from doing so.  *See Lax*, 489 F.3d at 1084 (finding that the Court "may not displace the [Commissioner's] choice between two fairly conflicting views, even though the court would justifiably have made a different choice had the matter been before it de novo" (internal quotation omitted)).

Plaintiff also contends that the ALJ failed to consider that the IBS diagnosis was subsequently revised to "non-tropical sprue (celiac disease)."  [#17 at 35]  Plaintiff does not explain how this revised diagnosis altered Plaintiff's alleged limitations resulting from the gastrointestinal issues—whether caused by IBS or celiac disease.  To the contrary, the only symptoms alleged by Plaintiff in her brief—diarrhea with constipation and abdominal pain occurring several times a day—are alluded to by the ALJ in his analysis of the RFC.  [#17 at 35; AR 19]

In determining Plaintiff's RFC, the ALJ states that he "considered all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence."  [AR 19]  Given the ALJ's references in the RFC narrative both to Plaintiff's IBS diagnosis and her own testimony about the accompanying symptoms, the Court has "no reason to doubt" that the ALJ took Plaintiff's gastrointestinal illness into account when placing significant limitations on Plaintiff's exertional limits in the RFC and when he inquired of the vocational expert

about the number of breaks and days off Plaintiff would be permitted.  *Wade*, 26 F. Supp. 3d at 1079.

### C.    The ALJ's Consideration of Non-Exertional Factors

Plaintiff next argues that the ALJ did not give adequate consideration to Plaintiff's non-exertional factors, "including the pain caused by [Plaintiff's] spine impairment and the pain and hygienic requirements caused by her gynecological and gastrointestinal diseases."  [#17 at 36]  Plaintiff inaccurately contends that "the ALJ did not specifically address the pain and nonexertional factors at all."  [#17 at 38]  As discussed above, the ALJ's RFC narrative expressly included references to the pain and hygienic requirements Plaintiff purportedly experienced as a result of her gastrointestinal and gynecological illnesses.  The ALJ's RFC narrative also discussed Plaintiff's testimony regarding the pain she experiences as a result of her back and shoulder injuries.  [AR 19]  The ALJ notes that he took all of Plaintiff's impairments and symptoms—which obviously includes these non-exertional factors specifically referenced in his narrative—into account in determining Plaintiff's RFC.  [AR 19] Again, Plaintiff has presented the Court with no reason to doubt the ALJ's representation and instead improperly asks this Court to reweigh the evidence.  *See Wade*, 26 F. Supp. 3d at 1079; *Lax*, 489 F.3d at 1084.

Plaintiff also argues that, to the extent the ALJ discounted Plaintiff's complaints of pain, he was required to address with more specificity the "*Luna* factors."  [#17 at 38]  As the Tenth Circuit has explained:

> The framework for the proper analysis of Claimant's evidence of pain is set out in *Luna v. Bowen*, 834 F.2d 161 (10th Cir.1987).  [The Court] must consider (1) whether Claimant established a pain-producing impairment by objective medical evidence; (2) if so, whether there is a "loose nexus"

> between the proven impairment and the Claimant's subjective allegations
> of pain; and (3) if so, whether, considering all the evidence, both objective
> and subjective, Claimant's pain is in fact disabling. *Id.* at 163-64.

*Musgrave*, 966 F.2d at 1375–76. Although the ALJ did not expressly reference the *Luna* factors, the RFC narrative discusses all three of these factors. The ALJ's RFC narrative includes a thorough discussion of Plaintiff's medical impairments and Plaintiff's subjective complaints of pain resulting from those ailments, thereby satisfying the first two *Luna* factors. [AR 19-23] Ultimately, however, the ALJ concludes that Plaintiff's subjective complaints of debilitating pain are not supported by the objective evidence or Plaintiff's own testimony regarding her daily activities. [AR 19-24] The ALJ provides specific references to the record to support his conclusion. For example, the ALJ notes that despite Plaintiff's testimony regarding the disabling pain she allegedly experiences, Plaintiff is able to perform personal care, fix simple meals, shop for groceries and do household chores and was able to assist her daughter in moving their property into a new apartment in September 2014 when the movers did not show. [AR 20] The ALJ reasonably concluded that "[t]he claimant has described daily activities that are not limited to the extent one would expect given her complaints of disabling symptoms and limitations." [*Id.*] The ALJ also highlighted numerous examples where the objective medical evidence did not support her self-reported pain level and concluded that "[t]he medical evidence shows mild to moderate findings that do not support the claimant's allegations of debilitating symptoms." [*Id.*] The Court finds the ALJ's analysis sufficient to satisfy the requirements of *Luna*. *See Paulek v. Colvin*, 662 F. App'x 588, 593 (10th Cir. 2016) (finding analysis sufficient where ALJ noted absence of "significant objective findings" and found that claimant's testimony regarding activities of daily living "not consistent with a totally disab[ling] level of physical impairment").

**D.    The ALJ's Consideration of Opinion Evidence**

Plaintiff argues that the ALJ improperly "credited the opinion of State Agency consultants over those of [Plaintiff's] treating physicians." [#17 at 39] "An ALJ must evaluate every medical opinion in the record . . . although the weight given each opinion will vary according to the relationship between the disability claimant and the medical professional." *Hamlin v. Barnhart*, 365 F.3d 1208, 1215 (10th Cir. 2004) (internal citation omitted). The regulations governing the SSA's consideration of medical opinions distinguish among "treating" physicians, "examining" physicians, and "nonexamining" (or "consulting") physicians. *Boyd v. Berryhill*, No. 17-CV-00722-MEH, 2017 WL 4877213, at *11 (D. Colo. Oct. 30, 2017); *see also* 20 C.F.R. §§ 404.1527(c), 416.927(c). "The opinion of an examining physician is generally entitled to less weight than that of a treating physician, and the opinion of an agency physician who has never seen the claimant is entitled to the least weight of all." *Robinson v. Barnhart*, 366 F.3d 1078, 1084 (10th Cir. 2004).

"According to what has come to be known as the treating physician rule, the Commissioner will generally give more weight to medical opinions from treating sources than those from non-treating sources." *Langley v. Barnhart*, 373 F.3d 1116, 1119 (10th Cir. 2004); *see also* 20 C.F.R. §§ 404.1527(c)(2) (stating that "[g]enerally, [the Commissioner] give[s] more weight to medical opinions from [the claimant's] treating sources"), 416.927(c)(2) (same). In determining how much weight to be given to a treating physician's opinion, the ALJ must first determine whether the opinion qualifies for "controlling weight." To make that determination, the ALJ

> must first consider whether the opinion is well-supported by medically acceptable clinical and laboratory diagnostic techniques. If the answer to

> this question is "no," then the inquiry at this stage is complete. If the ALJ finds that the opinion is well-supported, he must then confirm that the opinion is consistent with other substantial evidence in the record. In other words, if the opinion is deficient in either of these respects, then it is not entitled to controlling weight.

*Watkins v. Barnhart*, 350 F.3d 1297, 1300 (10th Cir. 2003) (internal quotations and citations omitted). Even if the treating physician's opinion is not entitled to controlling weight, however, it is "still entitled to deference and must be weighed using all of the factors provided in 20 C.F.R. § 404.1527 and 416.927." *Id.* (quotation omitted). Those factors are:

> (1) the length of the treatment relationship and the frequency of examination; (2) the nature and extent of the treatment relationship, including the treatment provided and the kind of examination or testing performed; (3) the degree to which the physician's opinion is supported by relevant evidence; (4) consistency between the opinion and the record as a whole; (5) whether or not the physician is a specialist in the area upon which an opinion is rendered; and (6) other factors brought to the ALJ's attention which tend to support or contradict the opinion.

*Id.* at 1301 (quotation omitted). The ALJ need not explicitly discuss each of these six factors in determining what weight to give a medical opinion. *Oldham v. Astrue*, 509 F.3d 1254, 1258 (10th Cir. 2007). However, the ALJ "must give good reasons ... for the weight assigned to a treating physician's opinion, that are sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reason for that weight." *Langley*, 373 F.3d at 1119 (internal quotations omitted). "[I]f the ALJ rejects the opinion completely, he must then give specific, legitimate reasons for doing so." *Watkins*, 350 F.3d at 1301 (quotations omitted).

Plaintiff complains that the ALJ gave "little weight" to the May 27, 2014 Physical Residual Functional Capacity Questionnaire completed by Plaintiff's treating primary

care physician, Dr. Brickley [AR 1014-18], but gave "substantial weight" to the February 10, 2014 Disability Determination Explanation provided by the state agency orthopedic medical consultant, Dr. Jose Ruiz [AR 123-54]. [#17 at 39-42; *see also* AR 23, 25] The ALJ explained that he gave little weight to Dr. Brickley's opinion because (1) Dr. Brickley had only seen Plaintiff for three months at the time the questionnaire was completed; (2) the contemporaneous treatment notes and Plaintiff's own Function Report indicated greater functioning than claimed in the opinion; and (3) the opinion was not supported by the objective medical evidence. [AR 25] The ALJ explained that he gave substantial weight to Dr. Ruiz's opinion because (1) Dr. Ruiz "is a highly qualified physician with knowledge of the rules and regulations regarding Social Security disability assessments;" (2) Dr. Ruiz's opinion referred to medical signs and findings; and (3) Dr. Ruiz's conclusion was "consistent with the evidence as a whole." [AR 23]

Plaintiff argues that the ALJ's decision to give Dr. Ruiz's decision more weight than that of Dr. Brickley "is contrary to the precept that an examining source opinion is presumptively entitled to more weight than a doctor's opinion derived from a review of the record," because Dr. Brickley had treated Plaintiff for several months, whereas Dr. Ruiz had only reviewed Plaintiff's medical records. [#17 at 39 (quotation and citations omitted)] Plaintiff's argument, however, is based entirely upon the false premise that the ALJ assigned more weight to Dr. Ruiz's opinion solely "because [Dr. Ruiz] had knowledge of the rules and regulations regarding Social Security disability assessments" and found Dr. Brickley's opinion less credible solely "because he had only been treating [Plaintiff] for three months." [#17 at 39, 40] However, these are only two of the factors considered by the ALJ in deciding how much weight to accord to the

medical opinions, and Plaintiff concedes that both of these factors—length of the treatment relationship and familiarity with SSA regulations—are appropriate factors to be considered in weighing medical opinions. [*Id.*] Without citation to any evidence, Plaintiff contends that the ALJ gave too much significance to these factors and found them to outweigh other factors. [*Id.* at 40] There is no indication in the ALJ's decision that he did so. To the contrary, the ALJ's decision makes clear that he also gave consideration to other appropriate factors—*i.e.*, whether the opinions were supported by the objective medical evidence and whether the opinions were consistent with other evidence in the record. Following his consideration of *all* of these factors, the ALJ accorded little weight to Dr. Brickley's opinion and substantial weight to Dr. Ruiz's opinion. [AR 23, 25]

Plaintiff makes an identical argument with regard to the ALJ's decision to accord consulting physician, Dr. Kimberlee Terry's opinion "substantial weight," in part, because "she is a highly qualified physician who is experienced in evaluating functional limitations and prescribing work restrictions as they relate to Social Security disability claims." [AR 24] As with Dr. Ruiz's opinion, however, this was only one of several reasons the ALJ provided for according substantial weight to Dr. Terry's opinion. The ALJ also explained that Dr. Terry's opinion "referenced specific medical signs and findings" and "her conclusion is consistent with the evidence as a whole." [AR 24]

Plaintiff also raises this same argument with regard to the mental opinion evidence, claiming that the ALJ erred in according "considerable weight" to the state agency psychiatric consulting expert, Dr. Barry Rudnick, while giving "less than full weight" to Plaintiff's treating psychiatrist, Dr. Erinn Stauter. [#17 at 43] Once again

Plaintiff's argument is premised on the unsupported contention that the ALJ gave undue consideration to the length of treatment relationship and familiarity with SSA regulations factors. As discussed above, however, these factors are appropriately considered in determining the weight to assign to an expert's opinion and the ALJ made clear that his determination of weight was based upon the application of several factors in addition to these two factors. With regard to Dr. Rudnick's opinion, the ALJ gave it considerable weight because, in addition to Dr. Rudnick's familiarity with the SSA regulations, the opinion referred to mental signs and findings in the record and was consistent with the evidence. [AR 24] The ALJ's decision to give Dr. Stauter's opinion less than full weight was based not only upon the limited treatment history, but also upon Dr. Stauter's opinion being "somewhat internally inconsistent," inconsistent with Plaintiff's activities of daily living, and the severity of the opinion exceeding the objective mental signs and findings. [AR 26]

The Court thus finds that the ALJ applied the correct legal standards in evaluating the relative weight to accord the medical opinion evidence and that the weight accorded those opinions is supported by substantial evidence.

Plaintiff also argues that the ALJ erred by disregarding "Dr. Brickley's opinion that [Plaintiff] needed to be able to change position at will," because it "was based on both the objective imaging evidence in the record . . . and on Dr. Brickley's hands-on examination of [Plaintiff] in September 26, 2014." [#17 at 41-42] As Defendant points out [#19 at 20], Plaintiff's argument is logically and factually unsupported as Dr. Brickley's May 27, 2014 opinion could not have been informed by his September 26, 2014 examination of Plaintiff. [*Compare* AR 1018 *with* AR 1113] Moreover, the notes

from the September 26, 2014 examination and other objective medical evidence referenced by Plaintiff demonstrate only that Plaintiff has spinal abnormalities, not that she needs to be able to change position at will. [*See* AR 1113]

Plaintiff next contends that the ALJ's finding that Dr. Terry "referenced specific medical signs and findings to support her opinion is factually erroneous." [#17 at 42] Specifically, Plaintiff notes that Dr. Terry failed to provide any narrative for question six of the form which asks the examiner to "[e]xplain how and why the evidence supports your conclusion in item 1 through 5" and to "[c]ite the specific facts upon which your conclusions are based." [AR 1610] As Plaintiff concedes, however, Dr. Terry did provide a narrative description of the medical evidence in the "Additional Comments" section of the form. [#17 at 43; AR 1616] Although Plaintiff characterizes this as "a very brief summary of some of the medical evidence," Plaintiff fails to identify any significant medical signs or findings not included in Dr. Terry's summary. [#17 at 43] Indeed, Dr. Terry's summary provides a specific account of the medical findings in the record upon which Dr. Terry's opinions appear to be based, including relevant dates. [AR 1616] The Court thus finds substantial evidence to support the ALJ's conclusion that Dr. Terry's opinion "referenced specific medical signs and findings to support her opinion." [AR 24]

### E.  The ALJ's Findings Regarding Shoulder Impingement

Finally, Plaintiff argues that the ALJ's findings regarding Plaintiff's shoulder impairment and the functional impairments related to it are not based on substantial evidence. [#17 at 44-46] First, Plaintiff complains that the ALJ devotes "only one paragraph" of the RFC narrative to Plaintiff's shoulder pain. [#17 at 44] Although

Plaintiff complains that the ALJ's analysis presents a "classic example of 'picking and choosing' from the evidence," Plaintiff fails to identify any specific evidence relevant to Plaintiff's shoulder injury that was not included in the ALJ's discussion. [*Id.* (internal quotation omitted)] Instead, Plaintiff takes issue with the following statement: "Based on reported symptoms, one doctor suggested shoulder surgery, but the MRI did not show impingement." [AR 22] Plaintiff contends that the ALJ's suggestion that the MRI did not show impingement is inaccurate because the MRI was silent as to impingement and thus "there is no evidence that the MRI did not reveal impingement." [#17 at 45] The Court finds this to be a distinction without a difference. Even characterizing the MRI as being "silent" as to impingement, the ALJ's statement that the MRI did not show impingement was factually accurate. The ALJ understandably may have found it noteworthy that the MRI did not affirmatively establish impingement. Plaintiff offers no evidence to undercut the significance of this—*e.g.*, Plaintiff offers no evidence to suggest that an MRI is not meant to diagnose impingement. There thus is no basis for the Court to find that the ALJ's interpretation of the MRI evidence was unreasonable. Although Plaintiff's interpretation of the evidence may also be reasonable, the ALJ's failure to adopt that interpretation does not constitute error. See *Guajardo v. Berryhill*, No. 16-CV-02772-KLM, 2017 WL 4875725, at *4 (D. Colo. Oct. 30, 2017) ("As long as the ALJ has reached a reasonable interpretation of the evidence, then that assessment controls, regardless of whether there are *other* reasonable interpretations of the evidence as well.").

Second, Plaintiff argues that "[t]he ALJ's interpretation of Dr. Terry's abbreviated notes is nothing more than speculation, and appears to be another example of the ALJ

picking and choosing, in this case from possible interpretations, in order to find support for a predetermined conclusion that [Plaintiff] is not disabled." [#17 at 46] Dr. Terry checked the box on the assessment form indicating that Plaintiff's "[r]eaching all directions (including overhead)" was "limited." [AR 1612]. In the section asking the examiner to "[d]escribe how the activities checked 'limited' are impaired," Dr. Terry wrote "occas R shldr impingement." [*Id.*] In the "Additional Comments" section at the end of the form, where Dr. Terry summarized the medical evidence, she further stated: "Appears limited to light w postural limits and R OH." [AR 1616] Plaintiff's representative argued to the ALJ that Dr. Terry's statements should be interpreted as limiting Plaintiff to only reaching on an occasional basis in all directions. [AR 24] The ALJ concluded, however, that when Dr. Terry's comments are read in combination, "it is clear that the limitation that is being called for is just limiting the right upper extremity overhead reaching to occasional" and that the comments "clearly qualify the general reaching limitation indicated." [AR 24] Despite this conclusion, the ALJ went "further and provided a more expansive limit on overhead reaching by limiting both upper extremities to occasional overhead reaching." [AR 24] Although Plaintiff argues that the ALJ's interpretation amounts to speculation and points out that Dr. Terry could have provided a fuller explanation of the reaching limitations [#17 at 46], Plaintiff provides no evidence from the record suggesting that the ALJ's interpretation was not reasonable. Given Dr. Terry's comments making clear that the reaching limitation was based upon the right shoulder impingement, the Court finds the ALJ's interpretation of Dr. Terry's reaching limitation reasonable and thus finds that the ALJ did not err. *See Jones v. Colvin*, 514 F. App'x 813, 819, (10th Cir. 2013) (finding no error because the ALJ's

interpretation of the medical expert's opinion, "when read as a whole, was reasonable" in limiting only her ability to reach overhead, and not her ability to reach in all directions).

## IV.    CONCLUSION

Accordingly, for the foregoing reasons, the Court **AFFIRMS** the Commissioner's decision that Plaintiff was not under a disability within the meaning of the SSA from March 31, 2012 through June 15, 2015.


DATED:  December 15, 2017                     BY THE COURT:

                                              s/Scott T. Varholak
                                              United States Magistrate Judge